[No. C001815. Third Dist. Aug. 18, 1987.]

LORETTA A. COURSEY, Petitioner, v.
THE SUPERIOR COURT OF SUTTER COUNTY, Respondent;
EUGENE COURSEY, Real Party in Interest.

COUNSEL

Coolidge & Gisi and Lyle D. Gisi for Petitioner.

No appearance for Respondent.

Minasian, Minasian, Minasian, Spruance, Baber, Meith & Soares and William H. Baber III for Real Party in Interest.

OPINION

SIMS, J.—Petitioner Loretta A. Coursey is the petitioner in a dissolution of marriage proceeding in Sutter County.[1] In that proceeding Loretta and her husband, Gene Coursey, stipulated that Gene would have regular visitations with the parties' 14-year-old daughter, L. The stipulation was entered as a minute order in the dissolution proceeding.

On Sunday, November 9, 1986, daughter L. refused to visit with Gene as scheduled. Gene responded by obtaining an order to show cause re contempt against Loretta. Following a hearing, the trial court adjudged Loretta in contempt for willfully violating the terms of the stipulated minute order. The trial court fined Loretta $500 and committed her to five days in jail, the latter stayed so long as L. successfully completes scheduled visitations with Gene. The trial court also ordered Loretta to pay Gene $1,000 for attorney's fees.

Upon Loretta's petition, we previously issued a writ of certiorari to review the proceedings. (See *Moffat* v. *Moffat* (1980) 27 Cal.3d 645, 656 [165 Cal.Rptr. 877, 612 P.2d 967].)

Loretta contends, inter alia, that the contempt adjudication must be annulled because there was no substantial evidence Loretta had the ability to comply with the order (by forcing L. to visit Gene) and no substantial

[1] Loretta Coursey v. Gene Coursey, Sutter County Superior Court No. 33254.

evidence she willfully disobeyed its commands. For the reasons which follow, we agree with these contentions.[2] We therefore annul the contempt adjudication.

### FACTUAL AND PROCEDURAL BACKGROUND

Loretta and Gene's marriage was dissolved in June of 1985. The parties agreed they would share joint legal custody of L., with Loretta having physical custody and Gene entitled to reasonable periods of visitation.

On August 25, 1986, Gene filed a motion to enforce his visitation rights with L. The matter was set for hearing on November 4, 1986.

On October 31, 1986, the parties and their attorneys held a settlement conference in Sutter County Superior Court. Present at the conference was L.'s therapist, Katherine Moore, a California licensed "Marriage Family Child Counselor." Moore advised the court that L. suffered from "Parental Alienation Syndrome" and as a result did not wish to visit with her father.

During the settlement conference the parties stipulated to a visitation schedule which was then entered verbatim in a minute order. In pertinent part, the stipulated order provided for visitation on Mondays and also stated: "It is agreed that for the following 90 days, Mr. Coursey is to have visitation with the minor on alternate weekends commencing at 9:00 a.m. Saturday to 6:00 p.m. Saturday night and again 9:00 a.m. Sunday to 6:00 p.m. Sunday night commencing 11/8/86. . . . [¶] Both parties are to encourage contact, communication and visitation between both parents and all the siblings of the marriage."

The first visitation, on Monday, November 3, 1986, took place as scheduled but L. did not want to go to the next visitation on Saturday, November 8. Moore convinced L. to attend the visitation, and it took place as scheduled.

Later Saturday evening, L. telephoned Gene and left a message on his answering machine stating she would not visit with him on Sunday. That evening, L. or Loretta telephoned Loretta's attorney, Lyle Gisi. Gisi tes-

---

[2] Loretta also contends the contempt must be annulled because: (1) the minute order (stipulation) is ambiguous and unenforceable; (2) the refusal to obey was by the minor daughter, not by Loretta; (3) the minute order is not a final order; (4) the order to show cause failed to allege Loretta's ability to comply with the minute order; (5) the trial court's punishment was excessive; (6) the attorney's fee award was improper; (7) the trial court should have disqualified itself pursuant to Code of Civil Procedure section 170.6; and (8) Loretta's due process rights were violated. In light of our disposition, we have no need to consider these matters.

tified he did not remember whether L. or Loretta called; he knew he talked to L. and believed he also talked to Loretta. Gisi then informed Gene's attorney, William Baber III, that L. would not be visiting; the latter so informed Gene Sunday morning.

On November 14, 1986, Gene filed a declaration for contempt and obtained an order to show cause re contempt. In the charging declaration, Attorney Baber declared Loretta had knowledge of the minute order because she was present in court on October 31, 1986, when it was entered. Baber declared: "Petitioner refused, refused to instruct, failed to encourage, or directly supported the minor daughter [L.]'s refusal to visit with her father on Sunday, November 9, 1986, from 9:00 a.m. to 6:00 p.m."

Gene also submitted the declaration of Michael Sexton who was an attorney in Baber's firm. Sexton's declaration recited the scheduled visitation; L.'s telephone call to Gene Saturday night; Gisi's telephone call to Baber; Baber's call to Gisi Sunday morning confirming that L. would not visit; and the fact that L. did not, in fact, visit that Sunday.

Loretta filed a motion to quash the order to show cause; following a hearing, the motion was denied.

The order to show cause was heard on November 25 and 26, 1986. Gene began by calling himself to testify. Gene described the making of the October 31, 1986, visitation order; he described his Saturday visit with L.; he recounted his agreement to meet L. at 12:30 p.m. Sunday after church; and he told of L.'s Saturday evening telephone call leaving a message on Gene's answering machine.

Gene next called Loretta to testify but Loretta refused on grounds of self-incrimination.

Gene next called Loretta's attorney, Gisi. Gisi testified he telephoned Attorney Baber Saturday evening, November 8, 1986, to tell him L. would not be visiting on Sunday. Gisi explained, "I told you [Baber] that she did not want to visit with her father Sunday and that she was not going to go on the visitation. That's what she had told me."

Gisi testified he may have talked to Loretta Saturday or Sunday morning. Gisi did not recount the contents of his conversation with Loretta. Following Gisi's testimony both sides rested.

In argument, Loretta's counsel noted she was charged with failing to encourage the visitation and with supporting the daughter's refusal to visit.

He suggested, "That has to be proven beyond a reasonable doubt. They have the burden of that, and there's been no proof as to that whatsoever."

The trial court found Loretta was aware of the October 31, 1986, minute order. The trial court evidently found that Loretta, rather than L., telephoned Gisi on Saturday night. It explained, "I suppose I can conclude that [L.] called up her mother's attorney. Even though Mr. Gisi is not quite sure by whom he was called, I'm not prepared to conclude that a 14-year old girl called up her mother's attorney."

The trial court concluded, "We have an order. We have knowledge of the order on the part of Mrs. Coursey. We have a child that was able to visit on Saturday and approximately 6:00 p.m. on Saturday we have a child that was prepared to visit on Sunday, and we have the decision being made Saturday evening or Sunday morning that the visitation would not take place.

"Construing the occurrences most favorable to Mrs. Coursey, at this point, I will assume that [L.] did not want to visit with her father. However, [L.] is not 18, her mother has care, custody and control over her, subject to the visitation order of October 31, and did not chose [sic] to exercise that control by requiring the visitation to take place."

The trial court continued, "While that agreement is in effect, or more accurately, until that agreement is changed or superseded, it's a Court order. And, if it is not observed and there's no substantial justification for not observing it, then there's the ability to comply with it and that amounts to a willful contempt of a Court order."

The trial court concluded, "In summary, Loretta Coursey was aware of the order. She had agreed to the order, otherwise there would not have been an order on October 31. She complied with the order on two occasions prior to November 9th. Then her attorney advised Gene Coursey's attorney that there would be no visitation on November 9th. There was [sic] no other explanations provided that I'm aware of. Specifically, there was no indication that there was physical incapacity as far as [L.] was concerned. The only indication was mental or emotional disinclination. [¶] I find you in contempt of that order."

Following the contempt adjudication the trial court considered the appropriate penalty. The trial court was careful to note that "we can't expand the evidence on the contempt, or lack thereof, by what's presented in terms of appropriate penalty." In the penalty phase the trial court heard at length from Katherine Moore who explained L.'s fear of her father. The trial court also heard testimony from Gene. Following the testimony Loretta was

sentenced as noted above. Written findings and a commitment order for contempt were filed December 2, 1986. This petition followed.

### DISCUSSION

Loretta contends, inter alia, the contempt adjudication must be annulled because there was no evidence at all, let alone substantial evidence, that she (1) had the ability to comply with the visitation order by compelling L. to visit Gene, or (2) willfully disobeyed the order either by refusing L. permission to visit, by refusing to instruct L. to visit, by failing to encourage L. to visit, or by directly supporting L.'s refusal to visit.

Before addressing these contentions, we emphasize we are fully aware of the importance of visitation by a child with *both* parents. This court in no way condones any avoidance of visitation obligations. However, various remedies are available for the failure of parents and children to accomplish visitation in good faith; these include an expansion of visitation rights granted the parent denied visitation and, if necessary, a change in physical custody of the child from one parent to another. (See Civ. Code, §§ 4600-4601.)

In this case, we confront the most drastic of all remedies available to redress a failure of visitation: the sanction of contempt of an order of court. ■ Because of the penalties imposed, a proceeding to punish an accused for contempt is criminal in nature. (*In re Coleman* (1974) 12 Cal.3d 568, 572 [116 Cal.Rptr. 381, 526 P.2d 533]; see *Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 913 [141 Cal.Rptr. 133, 569 P.2d 727]; *Reliable Enterprises, Inc.* v. *Superior Court* (1984) 158 Cal.App.3d 604, 612 [204 Cal.Rptr. 786].) An accused has a privilege against self-incrimination and cannot be compelled to testify against himself or herself. (*Crittenden* v. *Superior Court* (1964) 225 Cal.App.2d 101, 105 [36 Cal.Rptr. 903].) In the trial court, the movant bears the burden of proof beyond a reasonable doubt (*Ross, supra,* at p. 913) which it must meet unaided by the proposed contemnee (*Crittenden, supra,* at p. 105).

Thus, in this case, our job is not to inquire generally as to the equities of the parties shown by the whole record of the case. Rather, our limited task is to review whether substantial evidence was presented at the hearing on the contempt sufficient to prove the charge of criminal contempt beyond a reasonable doubt. As we shall explain, we find the evidence insufficient as a matter of law.

# I

## Standard of Review

██ The facts essential to establish jurisdiction in the contempt proceeding, and thus to enable the trial court to punish the accused, are: (1) the making of the order; (2) the accused's knowledge of the order; (3) the accused's ability to render compliance, and (4) the accused's willful disobedience of the order. It is also required that the accused be proceeded against under due process. (*In re Ny* (1962) 201 Cal.App.2d 728, 731 [20 Cal.Rptr. 114]; see *Reliable Enterprises, supra,* 158 Cal.App.3d at p. 616, fn. 3.)

██ "It is established that '[i]n reviewing an adjudication of contempt, "the sole question before us is one of jurisdiction of the trial court to render the judgment under review, and in such a case the review of the evidence is limited to determining whether there was any substantial evidence to sustain the jurisdiction of the trial court." [Citations.] More recently [our high court] said that "the responsibility of the reviewing court is merely to ascertain whether there was sufficient evidence before the trial court to sustain the judgment and order. The power to weigh the evidence rests with the trial court." ' [Citation.]" *Corenevsky* v. *Superior Court* (1984) 36 Cal.3d 307, 327 [204 Cal.Rptr. 165, 682 P.2d 360]; see *Coleman, supra,* 12 Cal.3d at p. 572; *Reliable Enterprises, supra,* 158 Cal.App.3d at p. 612.)

# II

## There Was No Evidence Loretta Had The Ability To Compel Her Daughter to Visit With Gene.

██ We first consider Loretta's claim there was insufficient evidence she had the ability to comply with the visitation order. To be held in contempt, the accused must have the ability to render compliance with the order. (*In re Ny, supra,* 201 Cal.App.2d at p. 731.) The visitation order provided that "Mr. Coursey is to have visitation with the minor on alternate weekends [including] 9:00 a.m. Sunday to 6:00 p.m. Sunday night . . . ." Loretta contends there was no showing she had the ability to compel a visitation if her 14-year-old daughter L. did not wish to attend. We agree.

We need not reach the question whether, if the child in question were a healthy one of tender years, a trier of fact could properly draw the inference that a parent exercised absolute control over the child, so that a failure of visitation could be fairly attributed to the parent's willful violation of the order. ██ ██ ██ ██ We have been cited to no rule of law holding that a 14-year-old child is under the absolute control of his or her parent,

nor are we aware of any.[3] Common experience tells us we may not merely assume without proof that a mother can reasonably compel a teenaged daughter to visit against the daughter's strong wishes. Here, the question whether the mother could reasonably compel her daughter to visit depended on proof of the circumstances surrounding the contemplated visit, including the relationships between the parties and their attitudes vis-á-vis the visit.

No evidence of Loretta's ability to compel her daughter's visitation was adduced at the hearing. As noted, Loretta's guilt was established on the testimony of Gene and Loretta's attorney. However, neither witness addressed the issue of Loretta's ability to control her daughter. Indeed, there was no evidence at all of Loretta's relationship with daughter L. Thus, there was no evidence that Loretta could discipline and control L. if she wanted to. Indeed, the only evidence of L.'s willingness to submit to authority suggested the contrary: she was evidently willing to disregard the court-ordered visitation schedule; inferentially, if L. were willing to disregard a

---

[3] We note however that in a variety of contexts, courts have held that whether a parent has exercised control over a child depends upon the circumstances of each particular case. Thus, for example, in *In re Corrigan* (1955) 134 Cal.App.2d 751 [286 P.2d 32], a dependency case, the mother took her three children (ages seven, eight and nine) from the family home and moved from one motel to another, during which time she was cohabitating with a man not the children's father. (*Id.,* at pp. 753-754.) The children were told to refer to the man as "daddy" and to themselves as "Johnsons" even though that was not their name. On these facts, the court held "[I]t is not necessary that conditions be so bad or so notorious as to become a public scandal before a juvenile court may step in for the protection and welfare of the children. The capability of a parent to exercise proper parental control is largely determined by external standards and the likely effect continued misconduct will ultimately have on the welfare of a child as it grows up and realizes the significance of such misbehavior rather than the immediate effect upon the child, particularly where it is very young. It is the conduct of the parent which determines whether he or she is capable of exercising proper parental control." (*Id.,* at p. 756.)

In *Marr* v. *Superior Court* (1952) 114 Cal.App.2d 527 [250 P.2d 739], this court was concerned with the adoption of an infant less than one year old after the child had been made a dependent child of the juvenile court. (*Id.,* at pp. 528-530.) We noted there that "Parental control means such control as parents ordinarily exercise and the phrase carries with it the implication of the purpose of parental control over such an infant, that is, its proper care and support, the usual incidents of the exercise of control over it." (*Id.,* at p. 530.)

In yet another dependency case, *In re J. T.* (1974) 40 Cal.App.3d 633 [115 Cal.Rptr. 553], the court considered a due process challenge to the dependency statute on grounds the requirement of exercising " 'proper and effective parental care or control' " was unconstitutionally vague. (*Id.,* at pp. 636-638.) The court concluded the statute was not impermissibly vague; the requirement could be given shape "in the context of a parent's fitness or unfitness in the proper care and support of his or her child." (*Id.,* at p. 638.)

Of course, each of these cases is inapposite here because they depended upon the application of dependency statutes not even remotely at issue in this case. The import of their holdings however is that resolution of whether a child is under the control of a parent is a factual question to be determined by the trial court under all the circumstances. We do no more than reaffirm that proposition here.

legal compulsion she would be willing to disregard her mother's commands as well.

In these circumstances, absent additional evidence, it cannot be fairly inferred that the failure of visitation was caused by the mother's willful violation of the visitation order. Thus, there was no substantial evidence of an essential element of the contempt adjudication. (*In re Ny, supra,* 201 Cal.App.2d at p. 731; *Corenevsky* v. *Superior Court, supra,* 36 Cal.3d at p. 327.)

The trial court found that if the court order "is not observed *and there's no substantial justification for not observing it, then there's the ability to comply with it. . . .*" (Italics added.) In so finding the trial court erred. As noted, the burden of proof is on the movant to prove contempt beyond a reasonable doubt. (*Ross, supra,* 19 Cal.3d at p. 913.) By deducing the ability to comply from the absence of proof of substantial justification, the trial court impermissibly shifted the burden to Loretta to establish her *inability* to comply. The trial court's error is obviously prejudicial because there was no other evidence of Loretta's ability to comply with the order. The contempt adjudication must be annulled.

### III

*There Was No Evidence Loretta Willfully Violated The Visitation Order.*

 The order of contempt must be annulled for another reason. To be held in contempt, the accused must willfully disobey the order. (*In re Ny, supra,* 201 Cal.App.2d at p. 731.) The charging declaration alleged Loretta "refused, refused to instruct, failed to encourage, or directly supported the minor daughter [L.]'s refusal to visit with her father on Sunday, November 9, 1986, from 9:00 a.m. to 6:00 p.m." Loretta contends there was no evidence she did any of these things. Again, we must agree.

The *only* evidence of *any* action by Loretta was her joining with L. in a telephone conversation with Attorney Gisi. The contents of the conversation were not adduced because Loretta successfully objected on grounds of attorney-client privilege. Loretta's mere *participation* in the telephone call cannot sustain a finding she undertook any action whatsoever. Indeed, it cannot be inferred from Loretta's mere conversing on the phone that she either agreed or disagreed with her daughter's decision. Whatever Loretta's view of L.'s decision not to visit Gene, common courtesy required Loretta to forward L.'s decision to her husband through counsel.

In sum, there was no substantial evidence Loretta willfully violated the visitation minute order. (*Corenevsky* v. *Superior Court, supra,* 36 Cal.3d at p. 327; see *In re Ny, supra,* 201 Cal.App.2d at p. 731.) The contempt adjudication must therefore be annulled for this reason as well.

Finally, we consider the $1,000 attorney's fee award. There is no contention that award was for any services other than those pertaining to the contempt proceeding. Thus, the fee award must fall with the contempt adjudication. We shall vacate the attorney's fee award.

DISPOSITION

The judgment of contempt is annulled. The attorney's fee award is vacated.

Carr, Acting P. J., and Roberts, J.,* concurred.

---

* Assigned by the Chairperson of the Judicial Council.